**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Richard CRAVERO,**
**Defendant-Appellee.**

No. 74–3314.

United States Court of Appeals,
Fifth Circuit.

April 23, 1976.

Gary L. Betz, U. S. Dept. of Justice, Miami, Fla., Frederick W. Read, III, Appellate Sec., Crim. Div., Robert Henry Plaxico, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

James J. Hogan, Miami Beach, Fla., George D. Gold, Miami, Fla., for defendant-appellee.

Before MORGAN, CLARK and TJOFLAT, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

In this case, the government appeals from the district court's granting of a motion for judgment of acquittal after the jury had returned a verdict of guilty. Defendant was tried before the United States District Court for the Southern District of Florida for one count each of a violation of 18 U.S.C. § 1622,[1] subornation of perjury, 18 U.S.C. § 1503,[2] obstruction of justice, and 18 U.S.C. § 371,[3] conspiracy. At the close of the government's case, defendant moved for judgment of acquittal pursuant to Rule 29, Fed.R.Crim.P. The district court reserved decision on the motion. After the jury returned a verdict of guilty on all three counts, the district court granted the defendant's motion. Arguing that the district court improperly ruled that there was insufficient evidence to sustain a conviction, the government appeals. We find that there was sufficient evidence to sustain a conviction, reverse the district court, and order the entry of judgment on the verdict.

This indictment grew out of an investigation in Miami, Florida, of the disposition of certain stolen securities. During that investigation, on May 7, 1970, Barry Glen Lipsky appeared and testified be-

1. 18 U.S.C. § 1622 states:

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined not more than $2,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 1503 states in pertinent part:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, . . . or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 371 states in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. . . .

fore a federal grand jury concerning the stolen securities. Lipsky had served as a stock broker at the Miami offices of the brokerage house of Weiss, Voisin, and Cannon. Before the grand jury, Lipsky testified under oath that an individual had entered his office and opened an account to engage in securities transactions. Later, that same individual had Lipsky sell 655 shares of American Express stock. The certificates representing this stock were later discovered to have been stolen. Lipsky was then asked specifically whether he knew Richard Cravero, the present defendant, as well as David Iacovetti, Robert Cardillo and Vincent Teresa. He denied knowing any of these persons. Sometime after his grand jury testimony, however, Lipsky told the United States Attorney's office that he had lied before the grand jury and implicated Cravero in a scheme to dispose of the securities. Armed with Lipsky's revelations, the government indicted Cravero.

At trial, Lipsky, the government's main witness, testified of his perjury before the grand jury and recounted, in detail, a version of the stolen securities transaction. According to Lipsky's testimony at trial, he was contacted by Cravero in February or March of 1969. At that time, Cravero told him that he knew of certain unnamed persons with stolen securities to sell. Cravero stated that the stock could not be traced and inquired as to whether Lipsky was interested in using his position to help dispose of securities. Lipsky then accompanied Cravero to a restaurant where they met Iacovetti. At the meeting of the three men, Iacovetti stated that if Lipsky could move the stock there would be a "few thousand" for him and that if the stocks were traced Lipsky could deny any wrongdoing and would "be in the clear." At a meeting where Cravero was not present, Iacovetti introduced Lipsky to Teresa and Cardillo. Under the plan developed, Lipsky sold stolen stock through a bogus account and gave the proceeds to Teresa.

After Lipsky sold the American Express stock, Cravero contacted Lipsky and angrily told him that Teresa and Cardillo had failed to pay Cravero his share of the proceeds. Lipsky gave Cravero $500 from his share.

A few days later, Lipsky's superior at the brokerage firm informed him that the American Express stock had been stolen. In response, Lipsky painted the scenerio he later related to the grand jury of an individual coming to his office and opening an account upon which Lipsky sold the stock. After making this explanation to his employer, Lipsky telephoned Cravero and told him what had happened, and asked him, "what am I supposed to do now?" Cravero stated, "you just go along with the story as it was prior arranged: that you don't know anything; that a man just walked in off the street and identified himself properly and sold the stocks as a legitimate individual, as a regular citizen." Lipsky was later interrogated by the FBI and again told the same story. When Lipsky related to Cravero what he had said to the FBI, Cravero replied that everything was fine.

Later, Lipsky was told by an unidentified person that Teresa had implicated him in a criminal matter. Lipsky related that information to Cravero who said that he would go to Iacovetti and find out what Lipsky should do. When Lipsky and Cravero met several hours later, Cravero told Lipsky that "there is no problem," that Lipsky should "play a dead hand," that Lipsky should "continue with the story the same as he had been doing," and that "no matter what [Lipsky] didn't know anybody." Finally, in April, 1970, after Lipsky was subpoenaed, he again contacted Cravero. Cravero instructed him:

> You go in there and you play a dead hand. You don't know anybody; you don't know any of these people that were involved in this deal. You don't know me, you don't know anything wrong that happened. Nothing happened wrong. You didn't do anything out of the ordinary in the course of selling stocks for a customer. And if you do all this you'll be alright. Just play a dead hand, you'll be alright.

Subsequent to this conversation, Lipsky testified falsely before the grand jury.

On cross-examination, Cravero's counsel presented a withering attack on Lipsky's credibility. After pointing out Lipsky's perjury before the grand jury, Cravero's counsel led Lipsky through a discussion of his various crimes. Lipsky conceded that he had pleaded guilty to federal charges for his part in disposing of the stolen securities. Lipsky, furthermore, admitted that he had both used and been a dealer of large amounts of heroin and cocaine. Lipsky conceded that he had forged his mother's name to approximately $18,000 worth of checks. Finally, Lipsky acknowledged that he had pleaded guilty to manslaughter for his participation in a particularly brutal murder and incineration of a government witness in New York state. Also in his cross-examination, Lipsky admitted that he had lied before a federal district judge during his probation hearing on the stock charges and had twice lied in narcotics trials in federal district court in New York. He also indicated that he expected favorable treatment from the government for his cooperation in testifying in several government prosecutions. During the cross-examination, the defense, moreover, had Lipsky read a letter in which he had written that he was completely without emotional feelings. In the letter, Lipsky further stated that, "I am a violent, vindictive, warped-minded cynic of a magnitude that you have absolutely no conception of." He wrote, in addition, that he wished that he could be allowed to go near the "nuts" or "psychos" so that he could "steam them up" and "laugh at them." Finally, the defense brought out other examples of deranged behavior on the part of the government's main witness. Lipsky had once thrown scales into the Biscayne Bay because they failed to reflect any weight loss, had once held a gun to his brother's head, and had shot his television set when there was a picture malfunction.

After the government rested, the defense called no witnesses. The jury returned a verdict of guilty on all three counts.

■ Defendant first argues that the district court's granting of a motion for judgment of acquittal is not appealable by the government. In *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), the Supreme Court has recently delineated the limits of governmental appeals under 18 U.S.C. § 3731. First, the Court concluded that the new statute allows the government to appeal unless the appeal is barred by the double jeopardy clause of the Constitution. 420 U.S. at 339, 95 S.Ct. at 1020, 43 L.Ed.2d at 239. After demonstrating that the main concern of the double jeopardy clause was to prevent a defendant from twice facing a trier of fact, the Court stated,

> We therefore conclude that when a judge rules in favor of the defendant after a verdict of guilty has been entered by the trier of fact, the government may appeal from the ruling without running afoul of the Double Jeopardy Clause. 420 U.S. at 352–53, 95 S.Ct. at 1026, 43 L.Ed.2d at 247.

We believe that this statement controls the present appeal. If this court reverses the district court's ruling on the motion for judgment of acquittal, the district court need only reinstate the guilty verdict of the trier of fact. There is no need for a separate trial. Under these circumstances, the government may appeal.[4] *See also, United States v. Jenkins,* 420 U.S. 358, 365, 95 S.Ct. 1006, 1011, 43 L.Ed.2d 250, 256 (1975); *United States v. Burnette,* 524 F.2d 29 (5th Cir. 1975).

■ Our decision that the government may properly appeal raises squarely the issue of whether there was sufficient evidence for the jury to sustain a conviction. We must view the evidence in a light most favorable to the government.

---

**4.** The defendant argues since the district court could have ruled on the motion for judgment of acquittal before submitting the case to the jury, this case is not appealable. In *United States v. Wilson, supra,* however, the trial court likewise could have ruled before the jury's verdict.

See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Burnette, supra; United States v. Weinstein, 452 F.2d 704 (2d Cir. 1971).

■ At trial, defendant argued that Lipsky was a totally unreliable witness and therefore the trial judge should rule that his testimony was not credible as a matter of law. The trial judge, on the other hand, before granting the post-verdict judgment for acquittal, stated that even accepting Lipsky's testimony he questioned whether the government had presented a sufficient prima facie case for the jury. We believe that the jury was the proper arbiter of Lipsky's credibility and that the government presented sufficient evidence to make out a prima facie case.

■ One of the oldest established rules of Anglo-American jurisprudence is that the jury is the arbiter of credibility of witnesses.[5] As the Supreme Court stated in Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 405, 418, 17 L.Ed.2d 374, 387 (1966),

> The established safeguards of an Anglo-American legal system leave the veracity of a witness to be detected by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.

The trial judge cannot arrogate to himself this power of the jury simply because he finds a witness unbelievable. See, United States v. Weinstein, supra, at 713. Under our system of jurisprudence a properly instructed[6] jury of citizens decides whether witnesses are credible. The trial judge is deemed to have no special expertise in determining who speaks the truth. Glasser v. United

States, supra; United States v. Parr, 516 F.2d 458, 464 (5th Cir. 1975); United States v. Davis, 487 F.2d 112, 126 (5th Cir. 1973); Williamson v. United States, 365 F.2d 12 (5th Cir. 1965); Puentes v. United States, 319 F.2d 581 (5th Cir. 1963).

■ Defendant bases his argument that there are situations wherein the court can properly ignore testimony of certain witnesses in determining sufficiency of the evidence on a passage in our opinion in Tillery v. United States, 411 F.2d 644 (5th Cir. 1966). There, this court stated,

> In determining whether there is substantial evidence in cases where a conviction rests upon the uncorroborated testimony of an accomplice, the general rule is that the uncorroborated testimony of an accomplice may support a conviction if it is not incredible or otherwise unsubstantial on its face.

We believe that for the testimony to be incredible it must be unbelievable on its face. The fact that Lipsky has consistently lied in the past, engaged in various criminal activities, thought that his testimony would benefit him, and showed elements of mental instability does not make his testimony incredible. Lipsky's testimony on direct is quite plausible. This is not a case where a witness testifies to facts that he physically could not have possibly observed or events that could not have occurred under the laws of nature. See, Geigy Chemical Corp. v. Allen, 224 F.2d 110, 114 (5th Cir. 1955). To be sure Lipsky was thoroughly impeached on cross-examination, but one cannot say that his testimony could not have been believed by a reasonable jury.[7] See, e. g., United States v. Hill, 463 F.2d

---

5. By 1670, the rule that the jury determines matters of fact was well established. Holdsworth, History of English Law, Vol. I, 3rd Ed. p. 345 (1922). In England, the court, however, could punish the jury by means of attaint if the jury decided a case "incorrectly." Under attaint, the first jury was tried by a second jury. If the second jury so found, the first jury could be subject to severe penalty for wrongly deciding the case. Attaint gradually fell into disuse and was abolished by Parliament in 1825. See generally, Thayer, Preliminary Treatise on Evidence at Common Law, 137–182 (1898).

6. The district court instructed the jury to scrutinize Lipsky's testimony with "caution and great care."

7. In fact, Lipsky's testimony has been believed by other juries even after having been subjected to generally the same impeachment on cross-examination. See United States v. Pacelli, 521 F.2d 135 (2d Cir. 1975).

235 (5th Cir. 1972); *United States v. Justice,* 431 F.2d 30 (5th Cir. 1970).

With Lipsky's credibility left to the jury, there was substantial evidence for conviction on all three counts. First, Lipsky's testimony clearly establishes an agreement between Cravero, Iacovetti, and Lipsky to give false testimony before the grand jury. *See, Williamson v. United States,* 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278 (1908); *Outlaw v. United States,* 81 F.2d 805 (5th Cir. 1936); *United States v. Kahn,* 366 F.2d 259 (2nd Cir. 1966). Lipsky's testimony, moreover, establishes that Cravero endeavored to obstruct justice by influencing Lipsky. *See, United States v. Russell,* 255 U.S. 138, 41 S.Ct. 260, 65 L.Ed. 553 (1921); *Overton v. United States,* 403 F.2d 444 (5th Cir. 1968); *United States v. Deluzio,* 454 F.2d 711 (10th Cir. 1972).

Defendant argues that there was insubstantial evidence on the subornation of perjury count because of the two witness rule.[8] The two witness rule was a judicially created rule of evidence that required two witnesses or one witness plus corroboration to prove perjury.[9] *Hammer v. United States,* 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118 (1926). In a trial for subornation of perjury, only the falsity of the witness' grand jury testimony must be proved by two witnesses. The inducement of the witness to commit perjury may be established by one witness' uncorroborated testimony. *Culwell v. United States,* 194 F.2d 808 (5th Cir. 1952). Apparently, defendant argues that the government never demonstrated by any testimony other than Lipsky's that Lipsky's original statements to the grand jury were false. Since the government must prove perjury under a subornation of perjury indictment, *United States v. Tanner,* 471 F.2d 128 (7th Cir. 1972), Cravero argues that the government failed to present a prima facie case.

We do not have to reach the merits of defendant's argument, for we hold that defendant at trial conceded Lipsky's perjury before the grand jury. During the presentation of the government's case, the United States Attorney requested a conference to discuss the matter of corroboration. The following colloquy took place:

> MR. BETZ: (United States Attorney) I don't know if Mr. Hogan (defense counsel) is going to argue corroboration. . . . You are not going to deny that he (Lipsky) did know him (Iacovetti)?

> MR. HOGAN: I am not going to put anybody on the stand. All I'm saying is that the man is a perjurer. That is what you are saying and we all agree.

> THE COURT: He is not going to try to contest the fact that he did know this man and that he told the grand jury he didn't know him and that he lied when he told them that. That's all. To me it is not an issue.

> MR. BETZ: I want to make sure our record was clear as far as perjury is concerned. (Trial transcript, 152–53.)

While the defense attorney's statement standing alone might be ambiguous as to whether he conceded that Lipsky had committed perjury before the grand jury, when coupled with the court's statement "It is not an issue" there can be no other interpretation than that the defense conceded Lipsky's perjury. To allow counsel for the defense to argue that the government's case lacks corroboration when the government's failure to bring forth additional evidence was in reliance upon defendant's concession would create the gravest injustice. *Cf. United States v. Adams,* 422 F.2d 515 (10th Cir. 1970). Defense counsel clearly has the authority to make judicial admis-

---

**8.** While the record is not clear on what grounds the district court granted the judgment of acquittal, the record clearly reflects the court rejected the argument that the government's case was defective because of failure to comply with the two witness rule.

**9.** Congress has repealed the two witness rule for perjury knowingly given before a grand jury. 18 U.S.C. § 1623. *See United States v. Gross,* 511 F.2d 910 (3d Cir. 1975). As a result of our disposition of this case, we need not reach the effect of the new statute here.

sions for his client during the course of the trial. *Camp v. United States*, 352 F.2d 800, 801 (5th Cir. 1965); *Floyd v. United States*, 260 F.2d 910, 912 (5th Cir. 1958); *Kennedy v. United States*, 259 F.2d 883 (5th Cir. 1958). There can be, moreover, no question that the defense's position was well considered. *See, Winters v. Cook*, 489 F.2d 174 (5th Cir. 1973) (en banc). In this case, Cravero's retained counsel never argued that Lipsky had not lied before the grand jury. In fact, the essence of the defense was that Lipsky was a continual and perpetual liar.

With ample evidence of inducement presented in support of the obstruction charge, the government had to demonstrate only the additional element of perjury in order to convict under the subornation count. *United States v. Knohl*, 379 F.2d 427, 443 (2d Cir. 1967); *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949). Since the element of perjury was conceded, there was ample evidence to find Cravero guilty of subornation of perjury. *See United States v. Gross*, 511 F.2d 788, 795 (4th Cir. 1959).

We find the district court erred in granting a judgment of acquittal. We reverse the district court's granting of the motion for judgment of acquittal and remand in order that the district court may enter judgment on the verdict.[10]

REVERSED AND REMANDED.

---

10. None of the parties have raised the issue of whether a motion for new trial under Rule 33, Fed.R.Crim.P., would now be timely. We express no opinion on the timeliness of such a motion.